IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

MATT OPPEN,

Plaintiff,

v.

HARVEST HEALTH & RECREATION INC.,
MARK N. BARNARD, STEVEN M. WHITE,
ELROY P. SAILOR, ANA DUTRA, EULA L. ADAMS,
and MICHAEL SCOTT ATKISON,

     Defendants.

---

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY DEMAND**

---

Plaintiff Matt Oppen ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

**NATURE OF THE ACTION**

1.    This is an action against Harvest Health & Recreation Inc. ("Harvest" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of Harvest by Trulieve Cannabis Corp. ("Truelieve").

1

**JURISDICTION AND VENUE**

2.     The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company conducts business in this District.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6.     Plaintiff is, and has been at all relevant times hereto, an owner of Harvest common stock.

7.     Defendant Harvest, together with its subsidiaries, cultivates, processes, sells, and retails inhalable, ingestible, and topical cannabis products in the United States. The Company is incorporated in British Columbia. The Company's common stock trades on the OTCQX tier of the OTC Markets under the ticker symbol, "HRVSF."

8.     Defendant Mark N. Barnard ("Barnard") is Chairman of the Board of the Company.

9. Defendant Steven M. White ("White") is Founder, Chief Executive Officer, and a director of the Company.

10. Defendant Elroy P. Sailor ("Sailor") is Chief Strategy Officer and a director of the Company.

11. Defendant Ana Dutra ("Dutra") is a director of the Company.

12. Defendant Eula L. Adams ("Adams") is a director of the Company.

13. Defendant Michael Scott Atkison ("Atkison") is a director of the Company.

14. Defendants Barnard, White, Sailor, Dutra, Adams, and Atkison are collectively referred to herein as the "Individual Defendants."

15. Defendants Harvest and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Proposed Transaction

16. On May 10, 2021, Harvest and Truelieve announced that they had entered into a definitive arrangement agreement pursuant to which Trulieve would acquire all of the issued and outstanding subordinate voting shares, multiple voting shares and super voting shares of Harvest. Under the terms of the agreement, Harvest shareholders will receive 0.1170 of a subordinate voting share of Trulieve for each Harvest subordinate voting share (or equivalent) held. The press release announcing the Proposed Transaction states, in pertinent part:

**Trulieve Announces the Largest US Cannabis Transaction; Acquisition of Harvest Health & Recreation Inc., Creates the Most Profitable Multi-State Operator in the World's Largest Cannabis Market**

NEWS PROVIDED BY
**Harvest Health & Recreation Inc.**
May 10, 2021, 07:05 ET

3

*Combined Company Will Maintain Industry Leading Scale in Retail, Cultivation & Production*

**Footprint Provides National Scale with a Deep Regional Focus in Attractive Markets**

**Expanded Runway for Growth with new Southwest Hub and Expanded Northeast and Southeast Hubs**

**Combined Consensus 2021E Revenue of $1.2 Billion**

**Trulieve and Harvest to Host a Joint Conference Call and Webcast today at 8:30 a.m. ET**

TALLAHASSEE, Fla. and PHOENIX, May 10, 2021 /PRNewswire/ -- Trulieve Cannabis Corp. ("**Trulieve**" or the "**Company**") (CSE: TRUL) (OTC: TCNNF) and Harvest Health & Recreation Inc. ("**Harvest**") (CSE: HARV,OTCQX: HRVSF) are pleased to announce they have entered into a definitive arrangement agreement (the "**Arrangement Agreement**") pursuant to which Trulieve will acquire all of the issued and outstanding subordinate voting shares, multiple voting shares and super voting shares (the "**Harvest Shares**") of Harvest (the "**Transaction**"). Under the terms of the Arrangement Agreement, shareholders of Harvest (the "**Harvest Shareholders**") will receive 0.1170 of a subordinate voting share of Trulieve (each whole share, a "**Trulieve Share**") for each Harvest subordinate voting share (or equivalent) held (the "**Exchange Ratio**"), representing total consideration of approximately $2.1 billion based on the closing price of the Trulieve Shares on May 7, 2021.

*    *    *

**Terms of the Transaction**

The Transaction will be effected by way of a plan of arrangement pursuant to the *Business Corporations Act* (British Columbia). Under the terms of the Arrangement Agreement, Trulieve will acquire all of the issued and outstanding Harvest Shares, with each Harvest Shareholder receiving 0.1170 of a Trulieve Share for each Harvest Share, implying a price per Harvest Share of US$4.79, which represents a 34% premium to the May 7, 2021 closing price of the Harvest Shares. After giving effect to the Transaction, Harvest Shareholders will hold approximately 26.7% of the issued and outstanding pro forma Trulieve Shares (on a fully-diluted basis). The Exchange Ratio is subject to adjustment in the event that Harvest completes certain interim period refinancing measures, with the potential adjustment in proportion to the incremental costs from such financing relative to the Transaction value. Additional details of the Transaction will be described in the management information circular and proxy statement (the "**Circular**") that will be mailed to Harvest Shareholders in connection with a special meeting of Harvest

Shareholders (the "**Meeting**") expected to be held in the third quarter to approve the Transaction.

The Transaction has been unanimously approved by the Boards of Directors of each of Trulieve and Harvest. Harvest Shareholders holding more than 50% of the voting power of the issued and outstanding Harvest Shares have entered into voting support agreements with Trulieve to vote in favor of the Transaction.

The Arrangement Agreement provides for certain customary provisions, including covenants in respect of non-solicitation of alternative transactions, a right to match superior proposals, US$100 million reciprocal termination fees under certain circumstances and reciprocal expense reimbursement provisions in certain circumstances.

The Transaction is subject to, among other things, the approval of the necessary approvals of the Supreme Court of British Columbia, the approval of two-thirds of the votes cast by Harvest Shareholders at the Special Meeting, receipt of the required regulatory approvals, including, but not limited, approval pursuant to the Hart–Scott–Rodino Antitrust Improvements Act, and other customary conditions of closing. Approval of Trulieve Shareholders is not required. Additional details of the Transaction will be provided in the Circular.

The Board of Directors of Harvest (the "**Harvest Board**") has unanimously determined, after receiving financial and legal advice and following the receipt and review of a unanimous recommendation of a special committee of independent directors (the "**Special Committee**"), that the Transaction is in the best interests of Harvest, and that, on the basis of the Fairness Opinion (as defined herein), that the consideration to be received by the Harvest Shareholders is fair, from a financial point of view, to the Harvest Shareholders.

The Harvest Board unanimously recommends that Harvest Shareholders vote in favour of the resolution to approve the Transaction. The Special Committee obtained a fairness opinion from Haywood Securities Inc., (the "**Fairness Opinion**") which provides that, as at the date of such opinion and based upon and subject to the assumptions, procedures, factors, limitations and qualifications set forth therein, the consideration to be received by the Harvest Shareholders pursuant to the Transaction is fair, from a financial point of view, to the Harvest Shareholders.

**Financial and Legal Advisors**

Canaccord Genuity Corp. acted as exclusive financial advisor and DLA Piper (Canada) LLP and Fox Rothschild LLP acted as Canadian and United States legal counsel, respectively, to Trulieve. Canaccord Genuity Corp. also provided a fairness opinion to the Board of Directors of Trulieve.

Moelis & Company LLC acted as financial advisor and Bennett Jones LLP and Troutman Pepper LLP acted as Canadian and United States legal counsel, respectively, to Harvest. Haywood Securities Inc. provided a fairness opinion to the Special Committee.

\*   \*   \*

**About Harvest Health & Recreation Inc.**

Headquartered in Tempe, Arizona, Harvest Health & Recreation Inc. is a vertically integrated cannabis company and multi-state operator. Since 2011, Harvest has been committed to expanding its retail and wholesale presence throughout the U.S., acquiring, manufacturing, and selling cannabis products for patients and consumers in addition to providing services to retail dispensaries. Through organic license wins, service agreements, and targeted acquisitions, Harvest has assembled an operational footprint spanning multiple states in the U.S. Harvest's mission is to improve lives through the goodness of cannabis. We hope you'll join us on our journey: https://harvesthoc.com.

**About Trulieve**

Trulieve is primarily a vertically integrated "seed-to-sale" company in the U.S. and is the first and largest fully licensed medical cannabis company in the State of Florida. Trulieve cultivates and produces all of its products in-house and distributes those products to Trulieve-branded dispensaries throughout the State of Florida, as well as directly to patients via home delivery. Trulieve is also a licensed operator in California, Massachusetts, Connecticut, Pennsylvania, and West Virginia. Trulieve is listed on the Canadian Securities Exchange under the symbol TRUL and trades on the OTCQX Best Market under the symbol TCNNF.

17.     On July 13, 2021, the Company filed a Schedule 14A Definitive Proxy Statement under Section 14(a) of the Exchange Act (the "Proxy Statement") with the SEC in connection with the Proposed Transaction.

**B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

18.     The Proxy Statement, which recommends that Harvest shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Harvest's and Trulieve's financial projections; (ii) the financial analyses performed by Harvest's financial advisors, Moelis & Company LLC ("Moelis") and Haywood Securities Inc.

6

("Haywood"), in connection with their fairness opinions; (iii) potential conflicts of interest involving Haywood; and (iv) the sales process leading up to the Proposed Transaction.

19. The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background to the Arrangement; (ii) Harvest's Reasons for the Arrangement; (iii) Recommendations of the Harvest Board; (iv) Opinions of Harvest's Financial Advisors; and (v) Harvest's Unaudited Financial Projections.

20. Unless and until the material misstatements and omissions (referenced below) are remedied before the August 11, 2021 shareholder vote on the Proposed Transaction, Harvest shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

**1. Material Omissions Concerning Harvest's and Trulieve's Financial Projections**

21. The Proxy Statement omits material information concerning Harvest's and Trulieve's financial projections.

22. With respect to the "*Management Financial Projections by Harvest*," the Proxy Statement fails to disclose: (1) all line items underlying (i) Revenue, (ii) Gross Profit, (iii) EBITDA, and (iv) Unlevered Free Cash Flow; (2) Harvest's net income projections; and (3) a reconciliation of all non-GAAP to GAAP metrics.

23. With respect to the "*Trulieve Adjusted Management Projections by Harvest*," the Proxy Statement fails to disclose: (1) all line items underlying (i) Revenue, (ii) Gross Profit, (iii) EBITDA, and (iv) Unlevered Free Cash Flow; (2) Trulieve's net income projections; and (3) a reconciliation of all non-GAAP to GAAP metrics.

24. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and combined company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisors in support of their fairness opinions. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisors, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisors' fairness opinions in determining whether to vote for or against the Proposed Transaction.

25. When a company discloses non-GAAP financial metrics in a Proxy Statement that were relied upon by its board of directors in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose, pursuant to SEC Regulation G, all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.[1]

26. The above-referenced omitted information, if disclosed, would significantly alter

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited July 28, 2021) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

the total mix of information available to the Company's shareholders.

### 2. Material Omissions Concerning the Financial Advisors' Analyses

27. In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Moelis and Haywood.

28. The Proxy Statement fails to disclose the following concerning Moelis' "*Discounted Cash Flow Analyses*" of Harvest and Trulieve: (1) all line items underlying the estimated future unlevered free cash flows projected by Harvest management to be generated by Harvest and Trulieve; (2) the estimated terminal value of each of Harvest and Trulieve; and (3) the individual inputs and assumptions underlying the (i) discount rates of 9.75% to 13.5% and 8.75% to 11.75%, (ii) perpetuity growth rates of 2.5% to 7.7% and 2.8% to 7.3%, and (iii) range of multiples of 9.0x to 12.0x and 10.0x to 14.0x.

29. The Proxy Statement fails to disclose the following concerning Moelis' analysis of analyst price targets for shares of Harvest and Truelieve: (1) the individual price targets observed by Moelis in its analysis; and (2) the sources thereof.

30. With respect to Haywood's "*Analysis of Select Publicly Traded Companies*," the Proxy Statement fails to disclose the individual multiples and financial metrics of each company Haywood observed in its analysis.

31. The Proxy Statement fails to disclose the following concerning Haywood's *Discounted Cash Flow Analyses* of Harvest and Trulieve: (1) the individual inputs and assumptions underlying the discount rate ranges and multiple ranges used in the analyses; (2) the terminal values; and (3) the implied per share ranges for Harvest and Trulieve resulting from the analyses.

32. The Proxy Statement fails to disclose the following concerning Haywood's analysis of analyst price targets for shares of Harvest and Truelieve: (1) the individual price targets observed by Haywood in its analysis; and (2) the sources thereof.

33. The valuation methods, underlying assumptions, and key inputs used by Moelis and Haywood in rendering their purported fairness opinions must be fairly disclosed to Harvest shareholders. The description of Moelis' and Haywood's fairness opinions and analyses, however, fail to include key inputs and assumptions underlying those analyses. Without the information described above, Harvest shareholders are unable to fully understand Moelis' and Haywood's fairness opinions and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 3. Material Omissions Concerning Potential Conflicts of Interest Involving Haywood

34. The Proxy Statement omits material information concerning potential conflicts of interest involving Haywood.

35. The Proxy Statement fails to disclose the timing and nature of the past services Haywood and/or its affiliates provided Harvest, Trulieve, and/or their affiliates, including the amount of compensation Haywood received or expects to receive for providing each service within the past two years of the date of its fairness opinion. *See* 17 C.F.R. § 229.1015(b)(4) (requiring disclosure of all material relationships between a company and its financial advisors and the compensation received by the advisors during the past two years).

36. Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

37.     The omission of the above-referenced information renders the Proxy Statement materially incomplete and misleading. This information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 4. Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction

38.     The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

39.     The Proxy Statement provides that, during the sales process, the Company entered into confidentiality agreements with potential buyers.

40.     The Proxy Statement, however, fails to disclose the terms of the Company's confidentiality agreements, including whether such agreements contained standstill provisions with "don't ask, don't waive" (DADW) provisions (including their time of enforcement) that would preclude potentially interested parties from making superior offers for the Company.

41.     Without this information, Harvest shareholders may have the mistaken belief that potential suitors are or were permitted to submit superior proposals for the Company, when in fact they are or were contractually prohibited from doing so. This information is material because a reasonable Harvest shareholder would want to know, prior to voting for or against the Proposed Transaction, whether other potential buyers are or were foreclosed from submitting a superior proposal.

42.     The Proxy Statement also fails to disclose whether the Company's Special Committee was empowered to (a) reject a transaction with Trulieve, and/or (b) conduct any market outreach.

43.     The Proxy Statement further fails to disclose: (1) the valuations in Trulieve's letters of intent, dated January 8, 2021 and January 11, 2021; (2) Trulieve's concerns with Harvest's

February 3, 2021 financial analysis; (3) the valuations in Trulieve's proposal letter, dated February 26, 2021; and (4) the specific terms and values set forth in Company A's proposal.

44. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**COUNT I**
**For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder**
**Against All Defendants**

45. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

47. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

48. The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

49. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange

Act and Rule 14a-9 promulgated thereunder.

50.     Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

51.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.     The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

53.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

54.     In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power

to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

55. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

56. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

57. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and

any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 28, 2021　　　　　　　　　　　　Respectfully submitted,

**HALPER SADEH LLP**

/s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
　　　　zhalper@halpersadeh.com

*Counsel for Plaintiff*